| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| *versus* § | CRIMINAL ACTION NO. 4:12-CR-180(13) |
| § | |
| HUEY L. KENNEDY § | |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Huey L. Kennedy's ("Kennedy") Motion for Immediate Release or Immediate Placement in Home Confinement (#632), wherein he requests that the court order his immediate release from custody or place him in home confinement to serve the remainder of his sentence due to Coronavirus Disease 2019 ("COVID-19"). The Government opposes the motion, and United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.  Background

Kennedy is currently serving a 80-month term of imprisonment stemming from his participation in a cocaine-trafficking conspiracy that spanned from 2009 to 2012 and involved at least 12 other conspirators. On June 2, 2014, Kennedy pleaded guilty to conspiracy to possess with intent to distribute between 5 and 10 kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and, on December 10, 2014, he was sentenced to 120 months' imprisonment, followed by a 5-year term of supervised release. His sentence was subsequently reduced to 80 months' imprisonment on July 16, 2015. Kennedy's offense of conviction was committed while he was serving a term of supervised release for a 2002 conviction in the Northern District of Texas

for conspiracy to possess with intent to distribute and distribution of cocaine and cocaine base. On August 15, 2015, his term of supervised release was revoked, and Kennedy was sentenced to 30 months' imprisonment to run consecutively to the sentence in this case. Kennedy is currently housed at the Federal Correctional Institution La Tuna, in Anthony, Texas ("FCI La Tuna ").[1] In the instant motion, Kennedy avers that he should be granted compassionate release because he is 43 years old, African American, and suffers from uncontrolled hypertension as well as stage three kidney disease.

II.     Compassionate Release

On December 21, 2018, the President signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under

---

[1] As of August 10, 2020, the figures available at www.bop.gov list 6 inmates and 5 staff members at FCI La Tuna as "Confirmed Active Cases" of COVID-19, show 7 staff members as recovered, and report no deaths from the disease.

> section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP); *Slate v. United States*, No. 5:09-CV-00064, 2009 WL 1073640, at *3 (S.D.W.Va. Apr. 21, 2009) ("Absent a motion from the BOP, the Court lacks authority to grant compassionate release."). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Harris*, No. 20-1723, 2020 WL 4048690, at *1 (3d Cir. July 20, 2020); *United States v. Springer*, No. 20-5000, 2020

WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

According to Kennedy, he submitted a request to the warden on April 2, 2020, to be reviewed under the CARES Act, and on April 12, 2020, he submitted a request for compassionate release. On June 2, 2020, the facility warden at FCI La Tuna determined that Kennedy's concerns did not meet the criteria of compelling and extraordinary reasons as outlined by 18 U.S.C § 3582(c)(1)(A) and denied his request for compassionate release/reduction in sentence. Although Kennedy appears to have complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to modify his term of imprisonment or to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of

the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[2] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

A.   Age and Health

The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

---

[2] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

U.S.S.G. § 1B1.13 cmt. n.1(A). Counsel appears, however, to misinterpret note 1(A)(ii) by suggesting that the phrase "that substantially diminishes the ability of the defendant to provide self-care . . ." applies only to note 1(A)(ii)(III), when, in fact, the phrase clearly applies to all three categories listed note 1(A)(ii).

Here, Kennedy identifies his "uncontrolled" hypertension and kidney disease as serious physical or medical conditions. A review of Kennedy's medical records confirms that he has suffered from hypertension and kidney disease for a number of years. When interviewed by Probation in connection with his Presentence Investigation Report in October 2014, Kennedy reported that he suffered from hypertension and stated that a surgical procedure had been performed on his urethra the preceding month. A physician note by a nephrologist dated April 10, 2019, indicated that Kennedy has chronic kidney disease, stage 3 (moderate), which was being monitored, and that his last kidney stone was in 2004, 16 years ago, adding that "drinking more water and following a low-salt diet will reduce his risk for kidney stones." Kennedy's blood pressure was recorded as 132/82, and it was noted that he was taking 4 medications to address his blood pressure problems. This blood pressure reading was less than the previous month, when it was recorded as 150/90 on March 6, 2019. On that occasion, the physician noted that Kennedy had experienced hypertension for at least 15 years, and she added a fourth prescription for clonidine to provide additional relief. The physician also advised that he take no ibuprofen, Advil, Motrin, or NSAID pain relievers, because they cause blood pressure to increase 6 to 8 points, recommending Tylenol for pain control instead. This year, on May 7, 2020, the provider stated that Kennedy appeared well, described his hypertension as asymptomatic, although his blood pressure had increased to 146/91, but noted that he had been non-compliant regarding some of his

medications. Further treatment plans include weekly blood pressure checks and monitoring, as well as follow-ups and medication reviews every 6 to 12 months for his kidney problems, with at least yearly checks of serum potassium and creatinine levels. As Probation points out, "Mr. Kennedy is receiving regular treatment and medication for his conditions," adding that "BOP's medical staff do not consider him to be a high-risk inmate."

While Kennedy may have identified serious physical or medical conditions, he has failed to demonstrate that the conditions substantially diminish his ability to provide self-care within the environment of a correctional facility. In fact, Kennedy is clearly ambulatory and can handle himself within the facility, as a medical record dated April 10, 2019, states the "[h]e does exercise by walking 90 min[utes] a day." In any event, his long-term medical problems did not prevent or impair him from engaging in a series of crimes prior to his 2012 arrest. Moreover, even if Kennedy's medical conditions constitute an extraordinary and compelling reason under § 3582(c)(1)(A), "compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).

B.     Attorney General Barr's Criteria for Home Confinement

Kennedy maintains that he qualifies for release under Attorney General Barr's March 26, 2020 Memorandum. Assuming this is true, the Memorandum "is an internal BOP policy statement adopted in connection with the discretionary decision making required under 18 U.S.C. § 3582(c)(1)(A) and provides guidance for wardens in making these discretionary decisions." *See Cannon v. United States*, CR 11-048-CG-M, 2019 WL 5580233, at *1 (S.D. Ala. Oct. 29, 2019). The policy, however, does not bind the BOP or the court, nor does it bestow any rights upon

Kennedy. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."). Thus, while Kennedy may have a colorable basis for requesting that the BOP approve a reduction in his sentence, he does not have a right to such a reduction.

    C.    "Other" Reasons

Kennedy's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

Kennedy maintains that he is at "high risk" of suffering adverse consequences if he contracts COVID-19 in light of his age, race, and medical history. Although Kennedy, age 43, expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Kennedy, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020))); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present

extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Thus, Kennedy has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to warrant his release from imprisonment. The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Chambliss*, 948 F.3d at 693-94. Kennedy's offense of conviction resulted from his participation in a large scale, drug-trafficking conspiracy that operated between 2009 and 2012 in which he was responsible for the distribution of between 5 and 15 kilograms of cocaine. His role in the conspiracy was to supply coconspirators with kilogram quantities of cocaine from various sources which would then be distributed to others in the Eastern and Northern Districts of Texas. Moreover, Kennedy's criminal history includes prior convictions for unlawfully carrying a weapon, failure to identify as a fugitive from justice, delivery of a controlled substance (cocaine base), and conspiracy with intent to distribute and distribution of more than 5 kilograms of cocaine and more than 50 grams of cocaine base. In addition, he was on supervised release at the time of the offense of conviction, and his supervision was subsequently revoked, netting him an additional 30 months of imprisonment. His prison disciplinary records also reveal that he was sanctioned for phone abuse in 2016 and that he escaped from the facility in 2018, when he was observed running from the wood line, for which he forfeited good time credit and lost other privileges. Although Kennedy claims that he is now "a changed man" and the court sincerely hopes this to be so, the court finds little solace in his record, which reflects continuing violations of the law and institutional rules,

despite his medical conditions, for over two decades. Thus, the court cannot conclude that Kennedy would not pose a danger to any other person or to the community, if released from prison.

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. To date, the BOP has placed 7,406 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes

that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020)). Here, Kennedy's track record is similarly a poor one.

In short, Kennedy has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 2020 WL 1940570, at *4-5 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 2020 WL 1940570, at *5.

III.  Home Confinement

In his Reply Brief, Kennedy concedes that "in the past Courts have deferred to the BOP for administering an inmate's sentence." Nevertheless, Kennedy contends that the court may recommend to the BOP that an inmate serve his sentence in home confinement. "[A] decision to designate a facility as a place of federal detention, pursuant to 18 U.S.C. § 3621(b), is 'plainly and unmistakably within the [BOP's] discretion and we cannot lightly second guess a deliberate and informed determination by the agency charged with administering federal prison policy.'" *Peagler v. Reese*, No. 5:07-CV-166, 2010 WL 1409854, at *1 (S.D. Miss. Apr. 2, 2010) (quoting *Abdul-Malik v. Hawk-Sawyer*, 403 F.3d 72, 75 (2d Cir. 2005)); *accord United States v. Wickett*, No. CR-08-18-B-W, 2010 WL 1500880, at *1 (D. Me. Apr. 13, 2010); *United States v. Vasquez*, No. C–03-CR-222, 2009 WL 2225426, at *1 (S.D. Tex. July 22, 2009); *United States v. Brooks*, No. B-99-378-001, 2006 WL 2323057, at *1 (S.D. Tex. Aug. 8, 2006). Indeed, "[t]he [BOP] has the sole authority to specify the place of incarceration for federal prisoners in its custody." *Vasquez*, 2009 WL 2225426, at *1 (citing *United States v. Voda*, 994 F.2d 149, 151-52 (1993)); *see United States v. Williams*, 65 F.3d 301, 307 (2d Cir. 1995).

At sentencing, a court may make a non-binding recommendation to the BOP regarding where a defendant should be imprisoned. *See* 18 U.S.C. § 3621(b)(4). Courts, however, are split as to whether such recommendation can be made post-judgment. *See, e.g., United States v. Mosz*, No. 2:15-CR-219-JCM(VCF), 2019 WL 539010, at *2 (D. Nev. Feb. 11, 2019) ("[T]his court does not have authority to issue a post-judgment recommendation."); *United States v. Bishop*, No. 07-00516 JMS (06), 2015 WL 13235851 at *2 (D. Haw. Oct. 2, 2015) (finding that there is no persuasive authority for a post-judgment judicial recommendation). *But see United States v.*

13

*Nelson*, No. CR 11-0152-6-CG-C, 2019 WL 1330919, at *2 (S.D. Ala. Mar. 22, 2019) (issuing a post-judgment recommendation); *United States v. Patterson*, No. 2:00CR187, 2019 WL 127962, at *1 (E.D. Va. Jan. 8, 2019) (same). Assuming courts have the authority to make such a recommendation, the court declines to do so here because, "compared to the BOP, this court has little to no information about whether the defendant's request is appropriate." *United States v. Jacko,* No. 14-CR-98-PP, 2019 WL 398829, at *2 (E.D. Wis. Jan. 31, 2019). Therefore, to the extent Kennedy's motion requests that the court make a non-binding § 3621(b)(4) recommendation, it is denied.

IV.   Conclusion

Consistent with the foregoing analysis, Kennedy's Motion for Immediate Release or Immediate Placement in Home Confinement (#632) is denied. Kennedy's motion for leave to file medical records under seal (#631) is granted. Kennedy's medical records are to remain sealed. The parties motions to extend response and reply deadlines (## 633 & 640) are denied as moot.

SIGNED at Beaumont, Texas, this 11th day of August, 2020.

*[signature: Marcia A. Crone]*

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE